No. 214 April 10, 2024 737

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRACY L. CHRIST,
aka Tracy Louis Christ,
*Defendant-Appellant.*

Umatilla County Circuit Court
19CR58152; A177035

Jon S. Lieuallen, Judge.

Argued and submitted November 13, 2023.

James Brewer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Lauren P. Robertson, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Hadlock, Judge pro tempore.

AOYAGI, P. J.

Affirmed.

**AOYAGI, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of methamphetamine. She contends that the trial court engaged in improper *voir dire* questioning of three prospective jurors (who were ultimately excused for cause), which discouraged other jurors from providing candid answers, thereby impairing defendant's right to an impartial jury under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution. Defendant assigns error to the court's denial of her motion for a mistrial based on the *voir dire* questioning.[1] We affirm.

## FACTS

During jury selection for her criminal trial on August 30, 2021, defendant requested that Jurors 506, 497, and 377 be excused for cause. This appeal pertains to the court's subsequent questioning of those jurors to decide whether to excuse them.

Juror 506 was married to a police officer and worked as an administrative assistant at a church. She expressed during *voir dire* that she would be biased against defendant, because she knows that not all of the facts get presented in court, and, even if the state did not present enough evidence, she would likely convict defendant on the assumption that there was more evidence out there. Defense counsel moved to excuse Juror 506 for cause. The prosecutor took no position.

The trial court then asked follow-up questions. It began by asking,

"[I]f the Court tells you what the law and the rules are, so you're saying you're going to—and that only the evidence that comes into the court can be considered—you're going to look and to violate the Court's order and find other evidence? Okay. So, I mean, I don't doubt that you have some

---

[1] In her opening brief, defendant separately assigns error to an earlier ruling, overruling her objection to the *voir dire* questioning of Juror 497, but presents a combined argument on both assignments. At oral argument, defendant acknowledged that the earlier ruling does not provide an independent basis for reversal and implicitly agreed that we need address only the mistrial ruling.

connections and stuff, but you work for the church, right? Okay, isn't part of that to be fair and impartial and to be understanding and to look at stuff, okay, and we talked [to the prior juror] about [being] the internal auditor, that's more or less its internal financial auditor is probably what I think the thing, and so checks and balances for an auditor, you mean, generally if one thing's on the ledger and the other side, so if—so, ma'am, I guess one of my concerns is if—and if that is truly your position but you—what in essence I just want to make sure for the record what you're saying is that you cannot be fair in this proceeding, that's what you're telling me."

Juror 506 responded, "Yes, sir." The court asked whether that meant that she could never serve on any jury and how far her bias went, and Juror 506 agreed that it would extend to all criminal cases, including grand juries. The court asked whether that meant that she should not be a witness either, as she could be impeached with her strong bias toward law enforcement, and she again agreed. The court excused Juror 506 for cause at that point. The court asked the court clerk to have Juror 506 placed on a civil jury list, "because my concern is people trying to get out of this stuff and so there's other places she can serve."

*Voir dire* continued. Juror 497 expressed concerns about COVID, citing her work as a kindergarten teacher and living with her father who was a respiratory therapist at a hospital. Defense counsel asked whether anyone felt that it would be distracting to sit close to people on a jury due to COVID. Jurors 497 and 377 identified themselves. After Juror 497 agreed she could not "give this trial the full attention it deserves," defense counsel moved to excuse her. The prosecutor took no position.

In response to questioning from the court, Juror 497 stated that she was trying to stay healthy to avoid infecting her students or her father who works with COVID patients, and that she suffers from uncontrollable anxiety. The court noted that those were "different issues" that it wanted to sort out and mentioned having some understanding of the anxiety issue from having a daughter with some anxiety. Regarding COVID, the court observed that if it released everyone who had a concern about COVID, then the

courtroom would be empty, and the court would not be able to have any trials, which would lead to dismissals because of speedy trial rights, which would shortchange both sides, because there would be no accountability and also no opportunity to clear one's name and be heard. The court talked about the COVID situation for a while, including contrasting sitting in a courtroom with 10 to 12 people spaced up to 12 feet apart against working in a school with 30 little kids who are always touching their faces.

The court then turned to the anxiety issue. It stated that it would not excuse Juror 497 for cause based on COVID concerns, because everyone has COVID concerns, but asked for more information about the anxiety issue, stating, "[T]ell me about your anxiety, so you said it's been increasing a little bit?" Juror 497 responded "yes," then began crying. The prosecutor interjected that it did not oppose Juror 497's release, given how upset she was, and given that it "didn't seem like many others had the COVID concerns." The court expressed some frustration with the prosecutor for changing his position on Juror 497 and for generally "sitting back and not helping at all, just waving off the stuff and so the Court is required to inquire." The court asked Juror 497 if she was able to continue, then resumed questioning her, asking if she had seen a professional for her anxiety. She said that she had. The prosecutor objected that the question was inappropriate, and defense counsel agreed that he did not like getting into Juror 497's personal life. The court implicitly overruled the objection, stating that it didn't "like making her uncomfortable" but that it had to ask questions because the prosecutor did not, there would be no jury if the court excused everyone who preferred to be elsewhere, and the court was trying to determine whether the juror had diagnosed anxiety that she was working on, in which case it would excuse her, or was invoking "anxiety" in a way that might necessitate more questions. The court then excused Juror 497 for cause, based on her response that she had seen a professional for anxiety. The court apologized to Juror 497 if its questioning made her uncomfortable, explaining again that such questioning was necessary to avoid the whole jury going out the door.

*Voir dire* continued. Defense counsel quickly returned to "the anxiety issue and the COVID issue," stating that he had never seen anyone have the kind of reaction that Juror 497 did and therefore took it very seriously and asked anyone that had "any issues" with being on the jury because of COVID to raise their hand. No one did. Defense counsel asked Juror 377 why she did not raise her hand given her previous response about COVID concerns. Juror 377 responded, "Oh, I did have some concerns there about the COVID, yes—."[2] On further questioning, Juror 377 stated that she worked in an assisted living facility, that she was vaccinated but that vaccinated people were testing positive, and that her concerns would affect her focus and concentration during the trial. Defense counsel moved to excuse Juror 377 for cause, adding, "I don't think we can ignore COVID. We can't ignore it." Defense counsel acknowledged that "we haven't had a bunch of people raise their hands" but expressed concern that the court "might have pressured a lot of people in here who might have had concerns into no longer raising their hand by the way you treated the prior [juror]." The court asked the prosecutor for his position on Juror 377. Before taking a position, the prosecutor asked if any other jurors shared Juror 377's COVID concerns. No one raised their hand. The prosecutor expressed no objection to excusing Juror 377, because "it seems like it's a limited issue."

The court asked Juror 377 follow-up questions to determine whether she was going to grocery stores and other public places, or whether she had severely limited her contact with other people, again stating that "everybody has concerns" about COVID and that it was trying to identify whether it was just something convenient to raise now to get off the jury. Juror 377 answered that, other than grocery stores and work, she stays home. She also confirmed that she felt unable to perform the duties of a juror because of COVID. The court excused Juror 377 for cause.

During the remainder of *voir dire*, no jurors expressed concerns about COVID or bias, and neither

---

[2] It is unclear on this record why Juror 377 did not raise her hand. Defendant postulates that she was put off by the court's handling of Juror 497, but that is somewhat belied by her candidness when prompted, and there could be any number of reasons.

party moved to excuse any other jurors for cause. Several jurors shared their views on topics like the state's burden of proof, drug legalization, and law enforcement. Two jurors expressed concerns about hardships—one financial, and one missing a vacation—if the trial lasted longer than a day. The jury was selected and sworn in, then released for a break.

At that point, defense counsel moved for a mistrial. Counsel argued that the court's questioning of Juror 497 "put a chill on the jury," such that other jurors "who may have been anxious and may have had concerns about COVID did not feel that they could come forward," out of fear "that you were going to quiz them about what type of medication they took, what type of health issues they have." Counsel also expressed "concern" that the court's questioning of Juror 506 about her religion had a "negative effect on the jury." Counsel asserted that the jury was "tainted" and could not be "fair and impartial." The prosecutor took no position on the motion itself but said that the state was also "concerned by the questioning of both individuals."

The court denied the motion. It reiterated that it questioned Juror 497 to determine whether what she was experiencing was nervousness or more serious preexisting anxiety, and that it questioned Juror 506 to determine in what areas of her life she "strives to be fair and impartial." The case proceeded to trial.

## ANALYSIS

We review the denial of a motion for a mistrial for abuse of discretion. *State v. Wasyluk*, 275 Or App 149, 150, 363 P3d 519 (2015). "[A] trial court does not abuse its discretion in denying a mistrial unless the effect is to deny the defendant a fair trial." *State v. Middleton*, 256 Or App 173, 178, 300 P3d 228, *rev den*, 354 Or 62 (2013).

Defendant contends that the trial court erred in denying her motion for a mistrial because the court's conduct interfered with her constitutional right to an impartial jury under Article I, section 11, and the Sixth Amendment. Specifically, she argues that the court's questioning of Jurors 506, 497, and 377 created an environment that discouraged

other jurors from providing honest answers, thus impairing her ability to conduct an effective *voir dire*. The state responds that defendant's mistrial motion was untimely, that she is raising materially different issues on appeal than she did in her motion, and that, in any event, the court did not abuse its discretion in denying the motion because it did nothing so prejudicial as to deny defendant a fair trial.

For present purposes, we assume without deciding that defendant's mistrial motion was timely. The timeliness question is nuanced—*see Dept. of Human Services v. J. E. D. V.*, 326 Or App 149, 156-57, 531 P3d 683 (2023) ("We take a nuanced approach to assessing the timeliness of mistrial motions that considers a number of factors with a view to ensuring that the foundational principles of the preservation requirement were met." (Internal quotation marks omitted.))—and need not be decided here because, even treating the motion as timely, we are unpersuaded that it was error to deny a mistrial. As for defendant raising different issues on appeal, we address that issue as it arises within our discussion. We proceed to the merits.

A criminal defendant has the right to an impartial jury. US Const, Amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ***."); Or Const, Art I, § 11 ("In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury ***.").[3] Consistent with that right, ORCP 57 D(1)(a), D(1)(b), and D(1)(g), applicable to criminal trials through ORS 136.210(1), allow a criminal defendant to challenge any prospective juror based on bias or incompetence that would prevent or substantially impair performance of the juror's duties. *See State v. Compton*, 333 Or 274, 285, 39 P3d 833, *cert den*, 537 US 841 (2002) (the test under ORCP 57 D(1)(g) "is whether the prospective juror's ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court").

"The purpose of *voir dire* is to ascertain the existence of grounds for a challenge for cause and to enable litigants

---

[3] Defendant does not contend that the two constitutional provisions require different analyses or would produce different results, so we analyze both together.

to obtain enough information to make an intelligent decision whether to exercise a peremptory challenge." *State v. Williams*, 123 Or App 546, 550-51, 860 P2d 860 (1993). A prospective juror's statement of bias "shall not of itself be sufficient to sustain the challenge, but the court must be satisfied, from all of the circumstances, that the juror cannot disregard such opinion and try the issue impartially." ORCP D(1)(g).

Trial courts have broad discretion in conducting *voir dire*. *See Mu'Min v. Virginia*, 500 US 415, 427, 111 S Ct 1899, 114 L Ed 2d 493 (1991) (trial courts have "wide discretion" to conduct *voir dire* and make inquiries that "might tend to show juror bias"); *State v. Barnett*, 251 Or 234, 237, 445 P2d 124 (1968) ("The scope of *voir dire* examination is in the trial court's discretionary power to efficiently and expeditiously conduct the trial."). Likewise, "a trial court's decision on a challenge for cause 'is entitled to deference and will not be disturbed absent a manifest abuse of discretion.'" *State v. Villeda*, 372 Or 108, 110, ___ P3d ___ (2024) (quoting *State v. Fanus*, 336 Or 63, 83, 79 P3d 847 (2003), *cert den*, 541 US 1075 (2004)). The court's duty is to ensure that an impartial jury is empaneled. *See Rosales-Lopez v. United States*, 451 US 182, 182, 189, 100 S Ct 1629, 68 L Ed 2d 22 (1981) ("Because the obligation to empanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*."); *Villeda*, 372 Or at 114-15 (a defendant's constitutional right to a trial by an impartial jury "is a matter which is and should be guarded zealously by the courts, and the courts should guarantee that juries consist of impartial persons" (internal quotation marks omitted)); *State v. Montez*, 309 Or 564, 575, 789 P2d 1352 (1990) (in deciding whether to excuse a prospective juror, the trial court must zealously protect both the accused's rights and the state's legitimate interests).

In this case, defendant contends that the trial court's questioning of Jurors 506, 497, and 377, taken together, impeded her ability to get honest answers from the jury, even though, as she concedes, no single aspect of the

court's handling of *voir dire* would have produced that result. Defendant further argues that the court's conduct was sufficiently prejudicial to be uncurable, thus denying her the right to a fair trial and requiring a mistrial. *See State v. Cox*, 272 Or App 390, 409, 359 P3d 257 (2015) ("[S]ome statements are so prejudicial that, as a practical matter, an instruction cannot remedy the prejudice."). The state responds that the court's inquires, both individually and collectively, were within the bounds of the court's discretionary oversight of *voir dire* and, in any event, did not rise to the level of requiring a mistrial.

The question as to when a trial court's conduct during *voir dire* impairs a defendant's ability to inquire of potential jurors to the point of violating the defendant's constitutional rights to an impartial jury is one not addressed by any existing Oregon case law. Importantly, the question is not whether the court handled *voir dire* perfectly, but whether the court's conduct was so prejudicial as to deny defendant a fair trial. *Cf. Bowen*, 340 Or at 508 (even if a prosecutor engaged in improper conduct, it is not an abuse of discretion for the trial court to deny a mistrial, unless the effect of the conduct was to deny the defendant a fair trial, "because the presumably harmful effect of prosecutorial misconduct may be obviated by a proper instruction" (internal quotation marks omitted)).

Here, we conclude that the trial court generally conducted *voir dire* in a manner within its authority and that any statements that may have tipped into impropriety were not so prejudicial as to require a mistrial. We emphasize that the issue here is the effect of the court's questioning of Jurors 506, 497, and 377 on other prospective jurors. The issue is *not* whether the court's questioning of Jurors 506, 497, and 377 was effective in gaining additional information from them or in potentially rehabilitating them—nor could it be, because the court in fact excused all three jurors for cause. *Cf. Villeda*, 372 Or at 118 (holding that the trial court abused its discretion in denying a for-cause challenge to a prospective juror, where the court gave too much weight to the juror's responses to "rehabilitative" questioning and to questioning from the court, relative to the juror's initial unprompted statements of bias).

We begin our discussion with two cases from other jurisdictions on which defendant relies, *U.S. v. Rowe*, 106 F3d 1226 (5th Cir 1997), and *Azucena v. State*, 135 Nev 269, 448 P3d 534 (Nev Sup Ct 2019).

In *Rowe*, the trial court began *voir dire* by issuing an arrest warrant for a prospective juror who had failed to appear and said to the venire panel, "Now aren't you all *** glad you appeared?" 106 F3d at 1228. After one juror expressed her inability to be impartial, the court accused her of "refusing" to put aside her personal opinions and "clearly" making up her answer "for the occasion." *Id.* The court excused her but ordered her to serve three consecutive months of jury service, stating that she would "be coming back again, and again, and again" and to "see if you can figure out how to put aside your personal opinions and do your duty to your country as a citizen." *Id.* The court similarly admonished a second juror who reported a bias toward law enforcement, stating, "It is appalling, actually that you would come into a court, and presume that people were guilty because they were standing here charged with a crime." *Id.* The court excused the juror as unable to follow the instructions of the court and again ordered three consecutive months of jury service, stating that "perhaps you can [make] some remedial constitutional inquiries in the meantime." *Id.* Weeks later, defense counsel reported that one of the prospective jurors was prepared to testify that, due to the court's admonishments, she "felt like she had no recourse but to sit there and keep her mouth shut, and that was the best thing she could do." *Id.* at 1229.

The Fifth Circuit concluded that the trial court abused its discretion in conducting *voir dire* as it did, because its conduct impaired the defendant's right to an impartial jury. *Id.* at 1229-30. The trial court's actions "cut off the vital flow of information from venire to court" and made it "impossible for counsel to get the information from potential jurors necessary for jury selection." *Id.* at 1230. By making the statements that it did, the court sent a clear message to the venire panel that jurors would be punished "for responding in the affirmative to questions about bias." *Id.*

In *Azucena*, the defendant was charged with sex offenses against children. 135 Nev at 269, 448 P3d at 536. During *voir dire*, the court berated and admonished a juror who expressed an inability to be impartial due to her exposure to child abuse in her work as a nurse. *Id.* The court accused the juror of "thinking up shit and try[ing] to make shit up" to get out of jury service. *Id.* at 270, 448 P3d at 536. The judge then threw a book at the wall while yelling, "You're going to completely throw out our entire justice system because you don't want to be fair and impartial." *Id.* The court excused the juror. *Id.* After that, no other jurors admitted to any perceived biases, including one who had previously disclosed being a victim of sexual abuse. *Id.* at 271, 448 P3d at 537. The Nevada Supreme Court held that the trial court's behavior and statements constituted judicial misconduct and violated the defendant's right to an impartial jury by "creat[ing] an atmosphere of intimidation and [doing] nothing to alleviate the impact of his behavior." *Id.* at 272-74, 448 P3d at 537-39.

Analogizing to *Rowe* and *Azucena*, defendant argues that the trial court's conduct in this case "created an environment in which jurors understood that, if they raised a concern that could lead to disqualification, their integrity would be impugned, they would be subjected to aggressive and unhelpful questioning, they could be disqualified from being a witness, and they would be responsible for criminal cases being dismissed." Defendant explains why she believes that individual questions or statements by the court were improper and, as a whole, created a chilled atmosphere.

We agree with the state that the trial court's conduct in this case is not comparable to that in *Rowe* and *Azucena*. The court did not admonish or berate the prospective jurors. It did not issue sanctions to excused jurors, such as three months of jury service, to punish them for expressing a bias or other concern about their ability to serve. It certainly did not use profanity or throw anything or otherwise engage in judicial misconduct. The only obvious frustration that the court expressed was toward the prosecutor for, as the court put it, "sitting back and not helping at all, just waving off the stuff and so the Court is required to inquire."

We next consider defendant's specific arguments about the questioning of individual jurors, beginning with Juror 506. Defendant argues that the court impugned Juror 506's integrity by asking her whether she would violate court orders and by implying that her "admitted bias conflicted with her religious beliefs" and constituted a moral failing. Defendant further argues that placing Juror 506 on the civil juror list would have been viewed as a sanction by the other jurors.

We are unpersuaded. After Juror 506 disclosed a bias for the state and revealed that she might find defendant guilty even without sufficient evidence, the trial court asked her to clarify if she was saying that she would "violate the Court's order and find other evidence" that had not been presented. The court then asked if her work at a church required her "to be fair and impartial and to be understanding and to look at stuff," explaining that it was trying "to make sure for the record what you're saying is that you cannot be fair in this proceeding, that's what you're telling me?" When Juror 506 maintained that she could not be impartial, the court sought to clarify the scope of her bias, and she clarified that it would be limited to criminal cases. The court also asked a question about her ability to be a witness, given the strength of her bias, and she agreed that she should not be. The court then excused her for cause, telling the clerk to put Juror 506 on the civil jury list, and noting its concern about "people trying to get out of this stuff and so there's other places she can serve."

In context, it is apparent that the trial court was trying to determine whether Juror 506 was actually as biased as she claimed, by testing her asserted bias from various angles, rather than simply taking her word for it. "When a criminal defendant moves to strike a prospective juror for cause, the trial court must determine whether the prospective juror's personal views would prevent or substantially impair his or her ability to perform the duties of a juror and decide the case impartially." *State v. Gollas-Gomez*, 292 Or App 285, 292, 423 P3d 162 (2018); *see also Villeda*, 372 Or at 111 ("The fact that a juror has preconceived ideas about a matter relevant to the case is not determinative. Rather,

the test is whether the prospective juror's ideas or opinions would impair substantially their performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court." (Internal quotation marks, citation, and brackets omitted.)). It is also apparent, from the court's comments throughout *voir dire*, that the court's overriding concern was a proper one—releasing prospective jurors for cause where cause existed, but not where it did not exist, to avoid improperly depleting the jury pool.

The specific reference to Juror 506's work for a church served to illustrate ways that Juror 506 might be called on to act impartially in her daily life, and we do not believe that other jurors would have understood the court to be questioning her religious beliefs or imposing moral judgment. As for the court's question about Juror 506's ability to be a witness and its direction to the clerk to put her on the civil juror list, defendant did not raise those issues in his mistrial motion. In any event, even if the witness question strayed a bit too far, it was not egregious. And, given Juror 506's assertion of a bias so strong that she could not serve impartially on any criminal jury, it was reasonable to put her on the civil juror list. Doing so is unlikely to have been perceived as a punishment.[4]

Turning to Juror 497, defendant makes three arguments as to how the court's questioning of her discouraged candor by other jurors, all of which we find unpersuasive. First, defendant argues that the court exaggerated the consequences of Juror 497 being unable to serve by "suggesting that she would be responsible for cases being dismissed or defendants going free unpunished[.]" In context, the jurors would have understood that the court's point was not specific to Juror 497. Rather, the court was trying to explain that, although everyone was understandably concerned about COVID in August 2021, the court could not excuse jurors based on such a generalized concern, as it would deplete the jury pool and result in dismissals due to the inability to

---

[4] Defendant also contends that the court's questioning of Juror 506 was improper because it was ineffective rehabilitation. As previously noted, because Juror 506 was excused, the effectiveness of any rehabilitative questioning is not at issue. What is at issue is the effect of the questioning of the excused jurors on *other* prospective jurors.

hold trials, and that the court would therefore need to delve deeper to determine whether an expressed concern about COVID was of such a nature that it would actually impair someone's ability to fulfill the duties of a juror. One might quibble with the court's wording at times, but that was an appropriate concern and an appropriate message.

Defendant next argues that the court was dismissive of Juror 497's concerns about COVID by suggesting that it was illegitimate to be concerned about getting COVID on jury duty when she worked every day with young children who, by virtue of their age, had poor hygiene. It was not improper for the court to consider the juror's other COVID exposures in assessing her expressed concern about jury service in light of COVID. We are also unpersuaded that the court's comments in that regard had any chilling effect on the other jurors, particularly when Juror 497 was subsequently excused on another basis (anxiety) and when the only other juror who had expressed concerns about COVID was excused based on those concerns.

Defendant lastly argues that the trial court "showed little concern" for Juror 497 when she began to cry in response to the court's first question about her anxiety. It is difficult to discern from a cold record how concerned or unconcerned the trial judge appeared, as body language may be as important as words in such circumstances. As for what the trial court said, it does not suggest a cold disregard. The court explained in detail the reasons for its questions about the "anxiety" that Juror 497 had mentioned. It expressly stated that it did not like making her uncomfortable, excused Juror 497 as soon as it was established that she was referring to "anxiety" in a clinical rather than colloquial sense, and apologized to Juror 497 for any discomfort caused by its questioning. The only frustration the court expressed was toward the prosecutor. The court's questioning of Juror 497 was not improper.

As for Juror 377, defendant argues that the trial court "exacerbated the problem already present" by not addressing Juror 377's COVID concerns and instead "question[ing] her credibility and accus[ing] her of a double standard." Defendant did not make any mention of Juror 377

in her mistrial motion. We agree with the state that it is too late for defendant to raise concerns about the court's questioning of Juror 377. We briefly address Juror 377, however, because the court's handling of that juror actually cuts against defendant's argument. In response to Juror's 377's explanation of her COVID concerns, the court asked questions to ascertain whether Juror 377 was generally avoiding contact with others, such that serving on a jury would be inconsistent with her efforts to minimize exposure, or whether she was generally going about her normal life despite COVID concerns, such that serving on a jury would be no more concerning than her other regular activities. As soon as the former was established, the court excused Juror 377 for cause. The court's question of Juror 377 was not improper and actually demonstrated the court's willingness to excuse someone based on COVID concerns in appropriate circumstances.

In sum, we are unpersuaded that the trial court's handling of *voir dire*—specifically its questioning of Jurors 506, 497, and 377, taken together—had a chilling effect on other jurors who were ultimately seated, such that they may not have answered candidly when asked about bias and other potentially disqualifying issues. Again, the question is not whether the court handled *voir dire* perfectly, but whether its conduct was so prejudicial as to deny defendant a fair trial. It was not. It is noteworthy that, after Jurors 506, 497, and 377 were excused, the other jurors expressed opinions on controversial topics like drug legalization, and two jurors expressed concerns about personal hardships from serving. That tends to suggest that the *voir dire* environment was not chilled. Defendant's strongest argument is that jurors would have been reluctant to express concerns about COVID after the court's questioning of Juror 497 and decision not to excuse her for COVID concerns. However, most of the jurors were asked *before* that happened whether they had concerns about serving due to COVID, and the only ones who said they did were Jurors 497 and 377, who were both excused. As for the two jurors who replaced Jurors 497 and 377, on whom defendant focused at oral argument, we are unpersuaded that the venire environment was so chilled as to COVID concerns that those jurors would not have revealed

COVID concerns if they rose to the level of interfering with jury service.[5]

      For all of those reasons, we conclude that the trial court did not err in denying defendant's motion for a mistrial.

      Affirmed.

---

[5] Defendant does not contend that the trial court's bar for releasing jurors based on COVID concerns was too high. Rather, it is how the court expressed itself on that issue while questioning prospective jurors that we understand to be at issue.